UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

VINCENT SALVATO, as Personal
Representative of the Estate of JOSHUA
SALVATO, for the benefit of Vincent
Salvato, surviving parent, Ana Rodriguez,
surviving parent, and the Estate of
JOSHUA SALVATO,

                Plaintiffs,

-vs-                                Case No.  5:12-cv-635-Oc-10PRL

CHRIS BLAIR, in his official capacity as
Sheriff of Marion County, Florida; Deputy
LAUREN  MILEY,  in  her  individual
capacity; and Deputy NORMAN BROWN,
in his individual capacity,

                Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

This case involves the death of Joshua Giovanni Salvato on the evening of July 6, 2012.  Prior to his death, Joshua had been stopped and was in the process of being arrested by two Marion County Deputy Sheriffs, Defendants Lauren Miley and Norman Brown.  During the course of his arrest, a physical altercation between Joshua and the two Deputies took place.  Deputy Miley shot Joshua once in the stomach, severing his iliac artery; Deputy Brown handcuffed and tasered Joshua multiple times after he had been shot.  Joshua died at the scene.  He was 21 years old, and he was unarmed.

Plaintiff Vincent Salvato, acting in his role as personal representative of Joshua's Estate, has filed a wrongful death and personal injury suit pursuant to 42 U.S.C. § 1983 and the Florida Wrongful Death Act, Fla. Stat. § 768.16, *et seq.*, against Sheriff Chris Blair in his official capacity as Sheriff of Marion County, Florida, and against Deputies Miley and Norman in their individual capacities (Doc. 14).  Mr. Salvato alleges that Deputies Miley and Norman used excessive force against Joshua, and failed to provide him with medical care, all of which resulted in Joshua's death.  Mr. Salvato further alleges that Sheriff Blair created and allowed various policies, customs, or practices pursuant to which deputy sheriffs would detain persons without probable cause, use excessive force during an arrest, and fail to provide adequate medical care to suspects in custody, and that these policies, customs, or practices contributed to Joshua's death.

Each of the Defendants have moved for summary judgment (Docs. 72, 74, 75), Mr. Salvato has filed responses in opposition (Docs. 92, 95), and the Defendants were granted leave to file reply briefs (Docs. 102-104).  Upon careful consideration of the Parties' motions papers and the record as a whole, the Court finds that the Defendants' motions are due to be granted in part and denied in part.

## Undisputed Material Facts

### I.    The Initial Encounter with Deputy Miley

At approximately 10:40 p.m. on July 6, 2012, the Marion County Sheriff's Office received a 911 call reporting a man walking along Sunset Harbor Road in Summerfield,

Florida.  According to the call, the man was stepping into oncoming traffic, yelling, and screaming at cars.  A second 911 call was received shortly thereafter, reporting someone in the same area jumping out in front of cars and throwing things at cars. Both calls described a white or Hispanic male, with no shirt and wearing long pants. There was no mention in either call of alcohol, drugs, or weapons.

Deputy Norman Brown was assigned the call.  However, Deputy Miley was nearby and arrived at the scene first at approximately 10:45 p.m.  Deputy Miley did not activate her lights or sirens, and there is no in-car dashboard camera video recording of her initial interactions with Joshua.  Deputy Miley has testified in her deposition that she saw Joshua walking along the side of the road, and that he matched the general description given by the 911 callers.  He was alone, wearing only long pants and flip flops, with nothing in his hands.  The night was hot and humid and Joshua was sweaty. It was also dark out, and there were no street lights or other ambient lighting in the immediate area.

Deputy Miley pulled her car off the roadway and called for Joshua to cross the street and talk to her.  He walked over to Deputy Miley and, without being asked, placed his hands upon the hood of her patrol car and spread his legs.  Deputy Miley then exited her patrol car, and Joshua stood up and walked towards her.  Deputy Miley noticed that Joshua was very sweaty and seemed to be acting "strange."  Joshua got fairly close to Deputy Miley, and she instructed him to step back, which he did. Deputy Miley asked Joshua if he had any weapons, and he replied "all I have is bread," and

reached into his pocket and pulled out two slices of bread.  Deputy Miley could see that

Joshua's waistband did not show any bulges that would have suggested he was

carrying a weapon.  Although Deputy Miley testified at her deposition that Joshua made

her feel "nervous" because he was acting "weird," she also testified that until Deputy

Brown arrived, Joshua was compliant with all requests and was not threatening her or

anyone else with bodily harm.  Deputy Miley never conducted a pat down or other

search of Joshua, and she did not restrain or handcuff him.

During this initial encounter, Joshua said "I'm not going to jail," although Deputy

Miley had not said or done anything to suggest that he was being arrested or going to

jail.  Deputy Miley attempted to ask Joshua questions to ascertain if he had committed

a crime, or required medical assistance.  Joshua muttered something about his dad,

restated that he was not going to jail, and started to walk away from Deputy Miley.

Deputy Miley then stepped in front of Joshua and put her hand on his chest to

stop him from leaving.  Joshua again said something about his dad, and then said to

Deputy Miley that he wanted to take her home and asked for her phone number.  At

this point, Deputy Miley radioed to Deputy Brown, who was en route to the scene, and

asked him to expedite his response.  Deputy Brown asked Deputy Miley if Joshua was

resisting or fleeing.  Deputy Miley replied that he was not, but that he was being

"verbally combative" and saying that he was not going to jail.  Until Deputy Brown

arrived on the scene, Joshua followed every command Deputy Miley gave and was fully

-4-

cooperative.  He did not raise his voice or his hands and did resist or act aggressively towards Deputy Miley.

## II.     The Arrival of Deputy Brown

Deputy Brown arrived shortly thereafter, and the remainder of the incident was recorded on his in-car dashboard camera, which the Court has viewed.  However the microphone was not activated so there is no sound.  When Deputy Brown stopped his vehicle, Deputy Miley was standing with her back to the camera and Joshua was standing relatively close to Deputy Miley, facing her.  Deputy Miley and Joshua were not engaged in any sort of confrontation.  It appears that they were conversing, and there are no signs of any resistance or non-cooperation.

As he exited his vehicle, Deputy Brown made no inquiry of Deputy Miley about Joshua or the circumstances of the stop in progress; the two officers said nothing to each other.  Instead, Deputy Brown got out of his car with his firearm drawn and pointed at Joshua, and ordered Joshua to get to the ground.  Joshua immediately complied and laid face down on the grass with his hands behind his back.

Deputy Brown holstered his weapon as he walked towards Joshua and Deputy Miley.  When Deputy Brown reach Joshua, he knelt down on Joshua's left side and pushed his head or shoulders down into the grass.  Deputy Brown also grabbed Joshua's arms and pulled them backwards. Deputy Miley then knelt down on Joshua's right side and attempted to secure Joshua's hands behind his back.  Both Deputies

removed their handcuffs, but after a moment, Deputy Brown put his away and Deputy Miley attempted to handcuff Joshua.

As Deputy Miley placed the handcuffs on Joshua's right wrist, he pushed her hands away, began to struggle, and was able to get to his knees.  Joshua, Deputy Miley, and Deputy Brown then entered into a brief physical altercation.  While the three of them were still on their knees, the Deputies and Joshua exchanged blows, some with closed fists.  Deputy Miley was knocked backwards, at which point Joshua got to his feet and briefly backed away.  It appears that Deputy Brown then began to reach for his taser, and Joshua rushed forward and briefly hit both Deputies again on their heads and shoulders.  Deputy Brown was knocked backwards onto the ground.

Deputy Miley stood up at the same time that Joshua disengaged and backed away for a second time.  As Joshua was backing up, he moved outside the viewing range of the dashboard camera.  Simultaneously with Joshua backing up from the Deputies, and while Deputy Brown remained on the ground, Deputy Miley extracted her firearm and fired one shot, striking Joshua in the abdomen.  Deputy Miley did not issue any warnings to Joshua before discharging her weapon.  At the time of the shooting, Deputy Miley and Joshua stood approximately 10 feet away from each other.  Deputy Miley also had a taser and a canister of pepper spray on her duty belt; she made no attempt to reach for either before shooting Joshua.

Deputy Miley testified that she shot Joshua because she believed that Deputy Brown had been injured and was unable to assist her.  She further testified that Joshua

was squaring up into a boxer's stance, had started to charge her again, and that she was in fear of severe bodily harm.  Arguably, the video from the dashboard camera does not support this portion of her testimony.  The dashboard camera video clearly shows Joshua retreating backwards.  He then steps out of viewing range (all that is viewable is his foot).  It is simply not clear whether Joshua was retreating in an attempt to escape, or he had stopped retreating and was preparing to attack the Deputies again.  What is clear, however, is that eleven seconds elapsed from the time Joshua got up from the ground when the Deputies were attempting to handcuff him, and Deputy Miley shot him.

Immediately after shooting Joshua, Deputy Miley lowered her weapon and backed away from Joshua.  Deputy Brown then got to his feet with his firearm drawn and pointed at Joshua.  He quickly holstered his weapon and pulled out his taser.  At this time, Joshua was still on his feet.  While outside the viewing range of the dashboard camera, Deputy Brown discharged his taser at Joshua, and the probes struck Joshua in his chest and back.  Deputy Brown testified that he discharged his taser the first time to prevent Joshua from attacking Deputy Miley.  However, at this point in time, Deputy Brown's patrol car was directly between Joshua and Deputy Miley, so it was not possible for Joshua to reach Deputy Miley.

Joshua fell to the ground after the first taser discharge.  He was on his back in the middle of the street.  Deputy Brown ordered Joshua to roll over onto his stomach. When Joshua did not immediately comply, Deputy Brown discharged his taser several

additional times until Joshua eventually rolled over onto his stomach.  Deputy Miley then handcuffed Joshua.  After Joshua had been shot, and was handcuffed and lying on his stomach, Deputy Brown continued to discharge his taser onto Joshua several additional times.  The records from Deputy Brown's taser show that it was discharged onto Joshua 12 times or "cycles."[1] (Doc. 94-8).  The Parties disagree as to how many of the discharges occurred after Joshua was handcuffed, however, there is no dispute that he was tasered at least three more times after he was handcuffed.

Deputy Brown testified that he was not initially aware that Joshua had been shot because he was still standing and not exhibiting any symptoms of being shot such as hunching over.  However, when Joshua fell to the ground on his back after being tasered, Deputy Brown noticed the gunshot wound.  Deputy Brown further testified that he continued to discharge his taser onto Joshua, even after Joshua was handcuffed, because he believed Joshua was attempting to reach for something in his back pants pockets.  Deputy Miley did not make any attempt to stop Deputy Brown from continuing to discharge his taser.  At one point, Deputy Miley also kicked Joshua's hand,

---

[1]Each "cycle" lasts for five seconds, during which time an electric shock is delivered.  If the trigger on the device is held down for more than five seconds, the device will reset and administer another five second shock.  The number of discharges and the time they occur is recorded internally by the taser.  The records for Deputy Brown's taser the night of July 6, 2012 show 12 cycles.  The Defendants argue that the records show that the first three cycles were really one 15-second continuously triggered event, and the next four cycles were one 20-second continuously triggered event.  The Plaintiff disagrees with this interpretation and claims that the records show 12 separate triggers.  Both sides agree, however, that the last five cycles were individual five-second discharges.

purportedly in an attempt to prevent him from getting into his pants pocket.  At no point in time did either Deputy conduct a search of Joshua.

Deputy Miley radioed for additional law enforcement and medical assistance immediately after she shot Joshua.  (Doc. 94-5).  Deputy Brown also called for medical assistance after Joshua had been handcuffed.  However, neither Deputy made any attempt to render any other medical assistance or first aid to Joshua.  Although Joshua was initially conscious and talking, he soon became listless.  The Marion County Sheriff's Office Computer Aided Dispatch Detail Report shows that paramedics arrived within six minutes of the initial call for assistance.  Id.  However, by that time Joshua was already dead.

The Medical Examiner determined that Joshua died from a gunshot to his abdomen which severed his right iliac artery and vein, causing him to suffer severe internal bleeding and death by exsanguination.  Although the Medical Examiner found traces of marijuana and an anti-seizure medication in Joshua's system, there is no evidence establishing that Joshua was under the influence of any drugs or alcohol at the time of his arrest and death.

## III.   Marion County Sheriff's Office Investigation and Relevant Policies

The Marion County Sheriff's Office did not conduct its own investigation into the shooting and death of Joshua.  (Doc. 94-14).[2]  Rather, the Florida Department of Law

---

[2]Sheriff Blair ultimately created a Special Committee to review the Sheriff Office's policies
(continued...)

Enforcement conducted the investigation, and forwarded its report to the State Attorney General.  A Grand Jury was convened to review the circumstances surrounding Joshua's death, and ultimately determined that criminal charges against either Deputy were not warranted.  Although both Deputies were removed from patrol duty, they were not subject to any formal discipline as a result of the events that occurred on July 6, 2012.  Both Deputy Miley and Deputy Brown remain employed by the Sheriff's Office, and work in the Corrections Department.

Prior to being hired by the Sherriff's Office in 2009, both Deputies Miley and Brown underwent background investigations, completed a 770 hour basic recruit training course, and passed a Florida Department of Law Enforcement State Officer Certification Exam.  Both Deputies also were required to complete annual training in use of force and other relevant issues.

At all relevant time periods, the Sheriff's Office had formal policies in place which governed the following issues:  (1) the use of force, including both non-lethal and deadly force and the use of firearms; (2) the internal investigation of complaints against officers; (3) the training to be provided to officers and employees on a calendar year basis; (4) the investigation of shooting incidents involving officers; (5) the use of tasers; and (6) the use of in-car dashboard cameras.   (Doc. 72-1, Exs. 8-14).

---

[2](...continued)
and training on handcuffing techniques and use of tasers.  It is undisputed, however, that there was no internal investigation of Deputy Miley's use of deadly force.

## IV.    Procedural History

Mr. Salvato filed his initial complaint on November 16, 2012 against the Marion County Sheriff's Office, and Deputies Miley and Brown (Doc. 1).  He amended his complaint on January 15, 2013 (Doc. 11), and again on January 25, 2013 (Doc. 14). The Second Amended Complaint alleges six claims against Defendants Sheriff Blair, Deputy Miley, and Deputy Brown.  Count I is brought under 42 U.S.C. § 1983, and is alleged against the Sheriff in his official capacity.  Count I asserts that the Sheriff permitted and/or created various policies, customs, or practices which violated Joshua's Fourth and Fourteenth Amendment rights and caused Joshua's injuries and death.  Counts II and III are also brought under 42 U.S.C. § 1983, and are asserted against Deputies Miley and Brown in their individual capacities.  Both claims allege that these Deputies used excessive force against Joshua and denied him medical care, causing Joshua's death and violating his Fourth and Fourteenth Amendment rights. Counts IV-VI are separate claims against each Defendant asserting a wrongful death action under Florida law.  Mr. Salvato seeks compensatory and punitive damages from each Defendant.

## Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  In applying this

standard, the Court must examine the materials on file and the record evidence "in the light most favorable to the nonmoving party." <u>Samples on Behalf of Samples v. Atlanta</u>, 846 F.2d 1328, 1330 (11th Cir. 1988).  When faced with a "properly supported motion for summary judgment [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d 995, 999 (11th Cir. 1997).  The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. <u>Evers v. Gen. Motors Corp.</u>, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value").

At the summary judgment stage the judge's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511 (1986).  Some degree of factual dispute is expected, but to successfully counter a motion for summary judgment the factual dispute must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248, 106 S. Ct. at 2510.

### Discussion

### I.    42 U.S.C. § 1983 Individual Capacity Claims

In Counts II and III of his Second Amended Complaint, Mr. Salvato alleges that Deputies Miley and Brown violated Joshua's Fourth and Fourteenth Amendment rights

by using excessive force against him and denying him medical care.  Both Deputies

assert entitlement to the defense of qualified immunity.[3]

"Qualified immunity protects government officials performing discretionary

functions from liability if their conduct does not violate 'clearly established statutory or

constitutional rights of which a reasonable person would have known.'" <u>Snider v.

Jefferson State Cmty. Coll.</u>, 344 F.3d 1325, 1327 (11th Cir. 2003) (quoting <u>Hope v.

Pelzer</u>, 536 U.S. 730, 122 S. Ct. 2508 (2002)).  Qualified immunity is an immunity from

_____

[3]Mr. Salvato's Second Amended Complaint is replete with allegations that Deputies Miley and Brown stopped and arrested Joshua without probable cause.  However, a claim for excessive force and a claim for unlawful arrest cannot co-exist.  "Under this Circuit's law . . . a claim that any force [used] in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim."  <u>Jackson v. Sauls</u>, 206 F.3d 1156, 1171 (11th Cir. 2000); <u>see</u> also <u>Motes v. Myers</u>, 810 F.2d 1055, 1059 (11th Cir. 1987) (stating that "[i]t is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation.").  An excessive force claim, on the other hand, "evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (<i>i.e.</i>, non-de minimus force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest."  <u>Bashir v. Rockdale Cnty., Ga.</u>, 445 F.3d 1323, 1332 (11th Cir. 2006).  Thus, the excessive force claim is subsumed in the illegal stop or arrest claim if the arrest lacked probable cause and is found to be unconstitutional but, to the extent the arrest was lawful, then the excessive force claim presents a discrete and separate constitutional violation "relating to the manner in which an arrest was carried out, and is independent of whether law enforcement has the power to arrest."  <u>Id.</u>

In this case, therefore, Mr. Salvato cannot proceed simultaneously on a claim of unlawful arrest and a claim for excessive force.  Because there is record evidence demonstrating that the Deputies at least had the right to detain Joshua, <u>see</u> testimony of Dr. Geoffrey Alpert, Doc. 67-2, p. 35, and based on a reading of Mr. Salvato's claims as set forth in the Joint Pretrial Statement (Doc. 122, pp. 2-4), the Court finds that Mr. Salvato's § 1983 claims are limited to theories of excessive force and denial of medical care.

suit rather than a mere defense to liability, and it is effectively lost if a case is erroneously permitted to go to trial.  Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 2815 (1985).

To receive qualified immunity, a government official must first prove that he was acting within his discretionary authority.  Gonzalez v. Reno, 325 F.3d 1228, 1234 (11th Cir. 2003).  Once the defendant establishes this, the burden shifts to the plaintiff to show that qualified immunity is not appropriate.  Id.  The Supreme Court has established a two-part test to determine whether qualified immunity should apply.  The court must determine whether the plaintiff's allegations, if true, establish a constitutional violation.  Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2514 (2002).  This requires the court to determine whether the facts alleged, taken in the light most favorable to the party asserting the injury, show the officer's conduct violated a constitutional right.  Gonzalez, 325 F.3d at 1234.  The second prong of the test requires the court to determine whether the right was "clearly established" at the time of the violation.  Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (quoting Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)).  Following the Supreme Court's clarification in Pearson v. Callahan, 555 U.S. 223, 129 S. Ct. 808 (2009), these two determinations may be made in either order at the discretion of the court.  Lewis, 561 F.3d at 1291.

**A.    Excessive Force**

"The Fourth Amendment's freedom from unreasonable searches and seizures ... encompasses the right to be free from the use of excessive force in the course of an investigatory stop[ ] or other 'seizure' of the person." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004).   To establish an excessive force claim, a plaintiff must first show that he was "seized" within the meaning of the Fourth Amendment. Vaughan v. Cox, 343 F.3d 1323, 1328 (11th Cir. 2003).

If that showing is made, the plaintiff must then establish that the force used to effectuate the seizure was unreasonable. See Brower v. County of Inyo, 489 U.S. 593, 597, 109 S. Ct. 1378, 1381 (1989).   "In determining whether the officers' force was reasonable, [a court] must determine 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.' " Mercado v. City of Orlando, 407 F.3d 1152, 1157 (11th Cir. 2005).   The court's inquiry focuses on whether the officer's actions were "objectively reasonable in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger, 381 F.3d at 1248 (internal citations omitted).   "[T]he reasonableness of a 'particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.' " Mercado, 407 F.3d at 1157 (quoting Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1872 (1989)).   The court must also

allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989).

"[T]here is no precise test or 'magical on/off switch' to determine when an officer is justified in using excessive or deadly force." Garczynski v. Bradshaw, 573 F.3d 1158, 1166 (11th Cir. 2009) (citing Scott v. Harris, 550 U.S. 372, 382, 127 S. Ct. 1769, 1777 (2007)). "[T]he particular facts of each case must be analyzed to determine whether the force used was justified under the totality of the circumstances. '[I]n the end [the court] must still slosh [its] way through the factbound morass of reasonableness.' " Id. (quoting Scott, 550 U.S. at 383, 127 S.Ct. at 1778) (internal citation and further quotation omitted).

> Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.

Graham, 490 U.S. at 396, 109 S. Ct. at 1872 (quoting Tennessee v. Garner, 471 U.S. 1, 8-9, 105 S. Ct. 1694, 1699-1700 (1985)). "As [the Eleventh Circuit] has clarified, the second factor can be reduced to a single question: whether, given the circumstances, [the suspect] would have appeared to reasonable police officers to have been gravely

dangerous." <u>Penley v. Eslinger</u>, 605 F.3d 843, 851 (11th Cir. 2010) (internal citations omitted).

> [T]he use of deadly force is more likely reasonable if: the suspect poses an immediate threat of serious physical harm to officers or others; the suspect committed a crime involving the infliction or threatened infliction of serious harm such that his being at large represents an inherent risk to the general public; and the officers either issues a warning or could not feasibly have done so before using deadly force. But . . . none of these conditions are prerequisites to the lawful application of deadly force by an officer seizing a suspect.

<u>Penley</u>, 605 F.3d at 851 (citing <u>Scott</u>, 505 U.S. at 382, 127 S. Ct. at 1777; <u>Garner</u>, 471 U.S. at 11-12, 1701).

In this case, there is no dispute that both Deputies Miley and Brown were acting in their discretionary authority and that Joshua was subject to a Fourth Amendment "seizure." There are, however, numerous disputed issues of material fact with respect to whether Joshua's constitutional rights were violated. Taking all of the facts in the light most favorable to Mr. Salvato, <u>Tolan v. Cotton</u>, __ S. Ct. ___, 2014 WL 1757856 (May 5, 2014), the Court cannot say as a matter of law that either Deputy Miley's or Deputy Brown's use of force on the night of July 6, 2012 was objectively reasonable.

It is undisputed that Deputies Miley and Brown were initially responding to an incident that did not involve any drugs, alcohol, weapons, or threats of violence. At the time Deputy Miley stopped Joshua she was not sure whether a crime had been committed, or if Joshua merely needed some assistance. It was an investigatory stop. It is further undisputed that at the time Deputy Brown arrived, aimed his firearm at

Joshua, ordered him onto the ground without any explanation, put his hands on Joshua's head and shoulders while Joshua was lying on his back, and pulled Joshua's arms behind him, Joshua was not posing any threat of serious physical harm to anyone.

The record is also devoid of any evidence that Joshua had committed a crime at the time Deputy Brown arrived at the scene, and Deputy Brown has testified that he was not aware that Joshua had engaged in any criminal wrongdoing at that point in time.  Clearly at the time the Deputies first encountered Joshua, he was not suspected of, or engaging in, any activity or crime which "involve[d] the infliction or threatened infliction of serious physical harm."  Garner, 471 U.S. at 11.  Taking these facts in the light most favorable to Mr. Salvato, a reasonable jury could find that Deputy Brown's actions in pointing his firearm at Joshua, ordering him to the ground, shoving his head and shoulders into the ground, and pulling his arms behind his back, were excessive. Deputy Brown correctly states that "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it."  Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  However, it is the law of this Circuit that officers "should employ the least intrusive means available" when conducting an investigatory stop.  United States v. Simms, 385 F.3d 1347, 1353 (11th Cir. 2004) (quoting Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983)). Further supporting this conclusion is the expert opinion and testimony of Mr. Salvato's

expert witnesses on police practices – Yolanda Carbia – who has testified that the use of force during the initial investigatory stop was excessive and improper.[4]

To be sure, once the Deputies attempted to handcuff Joshua, a physical altercation ensued. However, at the time Deputy Miley opened fire, the dashboard camera video shows that Joshua had backed away from both Deputies and was approximately 10 feet away from Deputy Miley. Deputy Miley contends that she fired on Joshua because he had stopped backing away and was preparing to charge at her again, but a review of the evidence, and in particular the dashboard camera video, creates a material issue of fact on this point. A reasonable jury could find that Joshua was backing away in an attempt to disengage from the officers and was no longer posing any risk of harm to them. A reasonable jury might also find that Deputy Miley's actions were excessive in any event because: (a) Joshua was unarmed; (b) she did not give any warning to Joshua prior to firing her weapon; and (c) she did not make any attempt to use other methods of subduing Joshua such as her taser or pepper spray. In addition, Deputy Brown, who had also been hit by Joshua and testified that he was in fear that Joshua would attack Deputy Miley, did not use his firearm against Joshua, but rather discharged his taser. See Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694 (1985); Gilmer v. City of Atlanta, 774 F.2d 1495, 1500-02 (11th Cir. 1985), abrogated on other grounds by Graham, 490 U.S. 386, 109 S. Ct. 1865 (both holding that an

---

[4]Ms. Carbia will also testify that Deputy Brown's repeated use of his taser, including after Joshua was handcuffed, was excessive.

officer used excessive force where officer shot suspect who was in the process of fleeing and therefore did not pose any danger to the officers).  See also Vaughn, 343 F.3d at 1331.[5]

Deputy Miley suggests that the facts of this case mirror those of Btesh v. City of Maitland, Fla., No. 6:10-cv-71-Orl-19DAB, 2011 WL 3269647 (M.D. Fla. July 29, 2011), and support a finding of qualified immunity.  In Btesh, a city police officer repeatedly shot an unarmed suspect during the course of investigating a reported crime, and a §1983 claim for excessive force was filed.  My colleague, Judge Fawsett, held that the officer's use of force was objectively reasonable and granted summary judgment in favor of the officer on the grounds of qualified immunity.  2011 WL 3269647 at ** 19-24. The facts of Btesh are readily distinguishable from the present case.  The officer in Btesh was responding to a reported rape, a violent felony.  The victim had recently sustained a head injury, and the suspect was acting in a violent and irrational manner from the moment the officer arrived on the scene.  The suspect managed to isolate the officer inside his locked apartment, and continued to approach the officer in a threatening manner with closed fists despite being warned by the officer several times to stop.  It was only after the officer gave several verbal warnings, and the suspect refused to stop his approach, that the officer fired.  Id. at ** 7-8.

---

[5]Mr. Salvato has also submitted the expert opinion and testimony of Dr. Geoffrey Alpert, Ph.D on this issue.  Dr. Alpert has opined that Deputy Miley's use of deadly force was improper and excessive.

Deputy Miley was faced with a vastly different scenario.  Taking the facts in the light most favorable to Mr. Salvato, Deputy Miley was responding to a nonviolent incident and was conducting an investigative stop.  Joshua was retreating from Deputy Miley at the moment she fired her weapon.  And Deputy Miley did not give Joshua any warnings prior to shooting him.  The Court therefore finds Btesh to be distinguishable.

The Court also finds that material issues of fact are in dispute with respect to Deputy Brown's multiple discharges of his taser.  While it is arguable that Deputy Brown acted reasonably when he first discharged his taser, see Draper v. Reynolds, 369 F.3d 1270 (11th Cir. 2004), from that point on, it is undisputed that Joshua was not actively resisting and was no longer a threat to either Deputy.  Further, Mr. Salvato has submitted expert testimony suggesting that Deputy Brown's continued discharge of his taser was excessive.  A reasonable jury could therefore find that Deputy Brown's 12 discharges of his taser, including several after Joshua had been handcuffed, constitute excessive force under the totality of the circumstances.  See Oliver v. City of Orlando, 574 F. Supp. 2d 1279 (M.D. Fla. 2008), aff'd, Oliver v. Fiorino, 586 F.3d 898 (11th Cir. 2009).

In sum, the Court finds that disputed issues of fact abound with respect to nearly every aspect of Joshua's stop, attempted arrest, and death on the night of July 6, 2012.  A reasonable jury could interpret these facts as establishing that Deputies Miley and Brown used excessive force against Joshua and violated his constitutional rights.

**B.     Clearly Established Law**

The second step in determining whether qualified immunity applies is whether the law was "clearly established" that the conduct of the state actor was unconstitutional.   Gonzalez, 325 F.3d at 1234.   "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about) the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."  Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 823 (11th Cir. 1997) (quoting Lassiter v. Alabama A & M Univ., 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc)).   To prove that the law was "clearly established," a plaintiff may point to either

> (1) earlier case law from the Supreme Court, [the Eleventh Circuit], or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation or (2) general rules of law from a federal constitutional or statutory provision or earlier case law that applied with 'obvious clarity' to the circumstances, establishing clearly the unlawfulness of the Defendants' conduct.

Long v. Slaton, 508 F.3d 576, 584 (11th Cir. 2007) (citing Marsh v. Butler Cnty., 268 F.3d 1014, 1031-33 (11th Cir. 2001) (en banc)).   A plaintiff may also show that an "official's conduct 'was so far beyond the hazy border between excessive and acceptable force that [the official] had to know he was violating the Constitution even without caselaw on point.'" Priester v. City of Riviera Beach, 208 F.3d 919, 926 (11th Cir. 2000) (quoting Smith v. Mattox, 127 F.3d 1416, 1419 (11th Cir. 1997)).

Joshua's Fourth Amendment right to be free from excessive force during the course of an investigatory stop was clearly established well before July 6, 2012.  See Sheth v. Webster, 145 F.3d 1231 (11th Cir. 1988) (holding that defendant officer was not entitled to qualified immunity on excessive force claim where there was no evidence suggesting that plaintiff posed a danger to the officer or others, and the officer pushed plaintiff against soda machine, then handcuffed her, and then dragged her to the police car).  See also Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) ("gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force."); Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1326 (1983) (officer should employ least restrictive means when conducting investigatory stop).

Joshua's Fourth Amendment right to be free from the use of deadly force was also clearly established well before his death.  See Tennessee v. Garner, 471 U.S. 1, 105 S. Ct. 1694 (1985).  The Supreme Court held in Garner that a law enforcement officer could not use deadly force to stop an unarmed suspect from eluding capture where there was no threat of physical harm to others.  The Eleventh Circuit has adopted this rule.  Vaughan, 343 F.3d at 1332 ("Under Garner, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others.").

Where a suspect is actively engaged in a physical confrontation with a law enforcement officer, the Eleventh Circuit has routinely applied qualified immunity.  Cf. McCormick v. City of Ft. Lauderdale, 333 F.3d 1234 (11th Cir. 2003) (officer did not

violate Fourth Amendment when he shot suspect who had committed aggravated battery, would not release walking stick despite being pepper sprayed twice, refused commands to drop the stick, and charged officer with stick in striking position); O'Neal v. DeKalb Cnty., 850 F.2d 653 (11th Cir. 1998) (officers' use of deadly force in shooting hospital patient was reasonable because patient had stabbed several people and, when told to drop his knife and lie on the ground, the patient rushed the officers with his knife); Harrell v. Decatur Cnty., 41 F.3d 1494 (11th Cir. 1995) (officer's shooting of plaintiff was reasonable where officer attempted to arrest plaintiff for driving under the influence, plaintiff attacked officer, and plaintiff got back into his car and reached under the seat for what might have been a weapon).

However, when an unarmed suspect is not threatening physical harm to the officers or others, and is merely disengaging or attempting to flee, the Eleventh Circuit has clearly rejected the use of deadly force. See Gilmere v. City of Atlanta, 774 F.2d 1495 (11th Cir. 1985) (en banc); Acoff v. Abston, 762 F.2d 1543 (11th Cir. 1985); Vaughan, 343 F.3d at 1332. See also Morton v. Kirkwood, 707 F.3d 1276 (11th Cir. 2013).[6]

In this case, construing the evidence in Mr. Salvato's favor, Joshua was not engaged in any physical violence at the time he was shot, and he did not present an

---

[6]Vaghan and Morton involved plaintiffs who attempted to flee by motor vehicle. This case presents facts weighing even more strongly in favor of the denial of qualified immunity. To the extent he was attempting to flee, Joshua was doing so on foot, without any weapons.

immediate threat to anyone on scene.  At the moment he was shot, a reasonable jury could find that he was fleeing.  Moreover, neither Deputy attempted to warn him prior to using deadly force.  It was clearly established at the time Joshua was shot that law enforcement officers could not use deadly force on a suspect under these circumstances.

Lastly, the Court finds that the law was clearly established at the time of Joshua's death that Deputy Brown's multiple taser discharges was excessive.  The Eleventh Circuit has held that qualified immunity applies where an officer deploys his taser <u>once</u> to subdue a "hostile, belligerent, and uncooperative" suspect. <u>Draper v. Reynolds</u>, 369 F.3d 1270 (11th Cir. 2004).  However, in 2009 this Circuit held that repeatedly discharging a taser onto a non-resistant suspect who posed no immediate threat constituted excessive force. <u>Oliver v. Fiorino</u>, 586 F.3d 898 (11th Cir. 2009) (denying qualified immunity where police officer continued to taser suspect at least seven times in two-minute period after he was lying on his back in the middle of the road). <u>See</u> <u>also</u> <u>Stephen v. City of Butler, Ala.</u>, 509 F. Supp.2d 1098, 1112-13 (S.D. Ala. 2007) (denying qualified immunity where the officers tasered an unarmed arrestee four times; the arrestee made no effort to escape and no movement that could be deemed an attack).  Thus, since at least 2009, Deputy Brown would have been on notice that discharging his taser onto Joshua up to an additional 11 times after Joshua was lying on the ground, with many of the discharges occurring after Joshua had been handcuffed and was subdued, was unconstitutional.

Having found that material issues of fact exist with respect to whether Deputies Miley and Brown used excessive force against Joshua, and that the law was clearly established at the time of Joshua's death, the Court holds that Deputies Miley and Brown are not entitled to summary judgment that qualified immunity applies to the excessive force claims.  The Deputies' motions for summary judgment will be denied as to these claims.

## C.    Denial of Medical Care

Mr. Salvato also alleges that Deputies Miley and Brown violated Joshua's Fourteenth Amendment rights when they failed to provide him with any medical assistance after he had been shot.[7]   To prove "deliberate indifference" to a serious medical need, a plaintiff must show " '(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence.'" Youmans v. Gagnon, 626 F.3d 557, 564 (11th Cir. 2010) (quoting Townsend v. Jefferson Cnty., 601 F.3d 1152, 1158 (11th Cir. 2010) (quoting Bozeman v. Orum, 422 F.3d 1265, 1272 (11th Cir. 2005)).  "The best response to a serious medical need is not required by federal law in these cases."  Id.  Rather, it is a fact specific inquiry, dependent in large part on the nature of the suspect's injury.

---

[7]Because Joshua was an arrestee at the time of his injuries, his claim of failure to provide medical care is governed by the Fourteenth Amendment's Due Process Clause.  Cottrell v. Caldwell, 85 F.3d 1480, 1490 (11th Cir. 1996).

The record evidence demonstrates that Deputy Miley called for medical assistance almost immediately after she shot Joshua.  Deputy Brown also called for medical assistance once he realized Joshua had been shot and was handcuffed.  The record evidence further demonstrates that paramedics arrived within six minutes of Deputy Miley's call.  It is therefore clear that Deputies Miley and Brown did not "disregard" Joshua's injuries.

While admitting that the Deputies called for medical assistance, Mr. Salvato argues that they were deliberately indifferent because they failed to render any medical care to Joshua themselves.  However, Mr. Salvato has not submitted any evidence establishing what medical care the Deputies should have provided.  His own expert, Nicholas D.A. Suite, M.D., did not identify any medical care that Deputies Miley and Brown could have provided, and agreed that the Deputies should not have performed CPR.  Rather, Dr. Suite testified that Deputies Miley and Brown should have checked Joshua's pulse and blood pressure, and transmitted that information to medical personnel, in the hope that the emergency medical personnel would have arrived sooner.  However, emergency medical assistance arrived within six minutes; and the Court is at a loss to see how they could have arrived any quicker.  Simply put, there is nothing in the record suggesting that Deputies Miley and Brown denied Joshua any medical care, nor has Mr. Salvato pointed to any Supreme Court or Eleventh Circuit

case law which would establish that the Deputies actions constitute deliberate indifference.[8]

Summary judgment shall be granted to Deputy Miley and Deputy Brown on the failure to provide medical care claim.

## II.    42 U.S.C. § 1983 Official Capacity Claim

In Count I of the Second Amended Complaint, Mr. Salvato asserts a § 1983 claim against Sheriff Blair, alleging that the application of excessive force and failure to render medical care was caused by a policy, custom, or practice of the Sheriff.  The Sheriff argues that Mr. Salvato has failed to produce sufficient evidence of any policy or custom that caused, or was the moving force behind, the violations of Joshua's constitutional rights.  Having found that there was no constitutional violation with respect to the purported lack of medical care, the Court will limit its analysis to the claim of excessive force.[9]

"For liability purposes, a suit against a public official in his official capacity is considered a suit against the local government entity he represents."  Owens v. Fulton County, 877 F.2d 947, 951 n. 5 (11th Cir. 1989).  The doctrine of respondeat superior

---

[8]This would be an entirely difference case if the Deputies did not immediately call for medical assistance.  Cf. Bozeman v. Orum, 422 F.3d 1265 (11th Cir. 2005) (finding deliberate indifference where corrections officers knew pretrial detainee was unconscious and not breathing and failed, for fourteen minutes, to check his condition, call for medical assistance, or do anything to help the detainee).

[9]In order to establish municipal liability under § 1983, the plaintiff must first establish that one or more of his constitutional rights were violated.  McDonnell v. Brown, 392 F.3d 1283, 1289 (11th Cir. 1987).

does not apply in actions under § 1983, and a municipality or a government agency "may only be held liable under 42 U.S.C. § 1983 when the injury caused was a result of municipal policy or custom." Lewis, 561 F.3d at 1293.  A municipal policy or custom is "a persistent and wide-spread practice." Church v. City of Huntsville, 30 F.3d 1332, 1345 (11th Cir. 1994).  A plaintiff must establish, not only that the policy or custom existed, but also that "actual or constructive knowledge of such custom" is attributable to municipal officials. Id.  Therefore, "random acts or isolated incidents" are generally not enough to establish municipal or governmental liability. Id.

Sheriff Blair has submitted the affidavit of Lt. Rick Englebright, an employee of the Marion County Sheriff's Office since 1989.  Lt. Englebright is responsible for overseeing the Training Division of the Sheriff's Office, and is familiar with the Office's Operations Directives (Doc. 72-1, Ex. 1).  Attached to Lt. Englebright's affidavit are copies of several Operations Directives that were in force at the time of Joshua's death. They cover the use of non-lethal and lethal force during the course of an arrest, the procedures for investigating claims of excessive force, and the procedures for annual training on the use of firearms and tasers.  Sheriff Blair contends that this undisputed evidence demonstrates that there were no customs, policies, or practices in place which contributed to Joshua's death.  Sheriff Blair further argues that Mr. Salvato cannot provide any evidence of prior incidents with similar facts which would have put the Sheriff on notice that his policies were inadequate, or that a widespread practice of using excessive force existed.

In response, Mr. Salvato argues that Sheriff Blair should be held liable under two different theories.  First, that Sheriff Blair ratified the actions of Deputies Miley and Brown by failing to conduct an investigation and failing to discipline them.  Second, that Sheriff Blair failed to properly train his Deputies.

## A.    Ratification

Mr. Salvato argues that Sheriff Blair should be held liable on a theory of ratification because he failed to order an internal investigation into the shooting of Joshua and did not discipline either Deputy Miley or Deputy Brown.

> [W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the officia's conduct for conformance with their policies.  If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.

St. Louis v. Praprotnik, 485 U.S. 112, 127, 108 S. Ct. 915, 926 (1988).

The Marion County Sheriff Office's Operations Directive 4030.70 provides that in all instances where a firearm is discharged resulting in a gunshot wound, or use of another weapon causing serious injury or death, the officer's immediate supervisor is to "[c]omplete and submit, through the chain of command, the Green Team Report, documenting recommendations and/or action taken." (Doc. 72-1, p. 63).  And in all cases resulting in a death, the Sheriff's Office is required to notify the State Attorney and to consult with the Florida Department of Law Enforcement to determine which agency will conduct the investigation. Id., p. 64.  However, in Joshua's case, no Green

Team Report was prepared.   Rather, Sheriff Blair directed that a "Special Review Committee Report" be prepared which addressed only the handcuffing techniques used on Joshua and the discharge of Deputy Brown's taser (Doc. 94-14).   There is no evidence in the record demonstrating that the Sheriff ever conducted its own internal investigation into Joshua's shooting.

The Florida Department of Law Enforcement and the State Attorney's Office investigated Joshua's shooting and death.   However, their investigation focused on whether there was sufficient evidence to support criminal charges.   Neither entity addressed whether any of the Sheriff's policies or training were deficient.

Mr. Salvato points to an analogous decision in this District, <u>Kimbrough v. City of Cocoa</u>, No. 6:05-cv-471-Orl-31KRS, 2006 WL 3335066 (M.D. Fla. Nov. 16, 2006).   In <u>Kimbrough</u>, the City of Cocoa failed to conduct an internal investigation into the arrest and beating death of a suspect.   The only investigation was conducted by the Florida Department of Law Enforcement.   2006 WL 3335066 at ** 7-8.   Judge Presnell held that:

> The evidence in this case indicates that the City should have conducted an internal investigation after the FDLE investigation was over. . . .   An internal investigation would have focused on whether the Officers followed CPD policy, rather than whether there was enough evidence to support criminal charges. . . .   In this case, the fact that the City failed to conduct further investigations or discipline any of its officers after the FDLE investigation was concluded, can support a claim of ratification.   A jury could find that the City was aware of the actions taken by its officers and their justifications, and that its failure to inquire any further or reprimand any of the Officers, shows that the City sanctioned not only their actions, but also the reasons behind those actions.

2006 WL 3335066 at * 8.

The Court finds <u>Kimbrough</u> persuasive and adopts its reasoning in this case.  A reasonable jury could find that Sheriff Blair's failure to investigate Deputy Miley's use of deadly force and failure to discipline her in essence ratified her conduct.  <u>See</u> also <u>Grandstaff v. City of Borger, Tex.</u>, 767 F.2d 161, 171 (5th Cir. 1985) ("[T]he subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy.").  This ruling, however, is limited only to Deputy Miley's use of deadly force.  The record shows that Sheriff Blair did conduct an internal investigation into the manner in which Deputies Miley and Brown attempted to initially handcuff Joshua, and also investigated Deputy Brown's use of his taser (Doc. 94-14).  The investigation focused specifically on the current training practices and polices for handcuffing suspects and using tasers, and analyzed whether improvements in the practices and policies were necessary.  Accordingly, the Court finds that there is no evidence that Sheriff Blair ratified Deputy Brown's use of his taser, or the manner in which Joshua was handcuffed.  <u>See</u> <u>Davis v. Williams</u>, No. 6:03-cv-1519-Orl-31KRS, 2006 WL 3618605 (M.D. Fla. Dec. 6, 2006) (rejecting ratification argument where Sheriff conducted internal investigation).

**B.    Failure to Train**

A "[m]unicipal policy or custom may include a failure to provide adequate training if the deficiency 'evidences a deliberate indifference to the rights of its inhabitants.'"

Lewis, 561 F.3d at 1293 (quoting City of Canton v. Harris, 489 U.S. 378, 388, 109 S. Ct. 1197, 1205-06 (1989)).  "To establish a [municipality's] deliberate indifference, 'a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action.'"  Id. (quoting Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998)).  "A [municipality] may be put on notice in two ways" – if it is aware of "a pattern of constitutional violations" but "nevertheless fails to provide adequate training" or "if the likelihood for constitutional violation is so high that the need for training would be obvious."  Id.  "In resolving the issue of [a municipality's] liability, 'the focus must be on the adequacy of the training programs in relation to the tasks the particular officers must perform,' and not merely on the training deficiencies for a particular officer."  Id. (quoting City of Canton, 489 U.S. at 390, 109 S. Ct. at 1205-06).  "It is thus irrelevant what training each specific officer present at the scene was given or retained."  Id.

Mr. Salvato argues that Sheriff Blair failed to provide proper training on: (1) detaining persons without probable cause; (2) the use of deadly force; and (3) the use of tasers, and that this lack of training contributed to Joshua's death.

With respect to the probable cause argument, Mr. Salvato has failed to come forward with any evidence of prior incidents of unlawful arrests, such that Sheriff Blair would be on notice that his deputies were insufficiently trained in this area.  The absence of such evidence alone is fatal to Mr. Salvato's argument.  Before municipal liability can arise based on the failure to establish a training policy or procedure, "the

need for such training must be plainly obvious to Department decisionmakers." <u>Wright v. Sheppard</u>, 919 F.2d 665, 674 (11th Cir. 1990). The need for training is not plainly obvious unless there is "evidence of a history of widespread abuse." <u>Id.</u> <u>See</u> <u>also</u> <u>Rocker v. City of Ocala, Fla.</u>, 355 Fed. Appx. 312, 314 (11th Cir. Dec. 3, 2009).

Instead, Mr. Salvato makes much of the fact that the Sheriff does not have any express written policy regarding the detention of citizens without probable cause – *i.e.* investigatory stops. However, this argument is weakened by the undisputed evidence in the form of Lt. Englebright's affidavit, in which he avers that "Deputies Miley and Brown, as well as the other deputies at the Sheriff's Office, also receive ongoing training and instruction in the various topics of constitutional rights, including the constitutional amendments and the law surrounding the requirement for probable cause." (Doc. 72-1, p. 6, ¶ 19). Such training includes providing deputies with annual editions of the Florida Law Enforcement Handbook, which addresses probable cause, and case law updates. In addition, Mr. Salvato's own expert, Geoffrey P. Alpert, Ph.D., testified that both Deputies Miley and Brown had reasonable suspicion and arguable probable cause to detain Joshua for possible mental health evaluation. (Doc. 67-2, p. 35). Moreover, under the law of this Circuit, any purported claims for illegal arrest cannot co-exist with a claim for excessive force. Based on the record evidence, Mr. Salvato has not established a viable theory of municipal liability based on a purported lack of training on probable cause.

Next, Mr. Salvato focuses on the events that transpired on July 6, 2012. According to Mr. Salvato, the actions of Deputies Miley and Brown were "parroted" up the chain of command, and that no one within the Sheriff's Office ever questioned the Deputies' version of events.   Mr. Salvato contends that these facts demonstrate that all of the officers involved in Joshua's death and subsequent investigation must have been acting in concert under some unwritten policy which permitted the use of excessive force.  This argument is without merit as a single event cannot establish a municipal policy or custom, or a lack of adequate training.  Craig v. Floyd Cnty., 643 F.3d 1306, 1310 (11th Cir. 2011) (" 'Proof of a single incident of unconstitutional activity is not sufficient to impose liability' against a municipality.") (quoting City of Okla. City v. Tuttle, 471 U.S. 808, 105 S. Ct. 2427 (1985)).  "A pattern of similar constitutional violations is ordinarily necessary.  A single incident would not be so pervasive as to be a custom because a custom must be such a longstanding and widespread practice that it is deemed authorized by the policymaking officials because they must have known about it but failed to stop it."  Id. (internal citations omitted).

In an attempt to establish his claim, Mr. Salvato also points to records of prior Green Team reports involving Deputy Miley and Deputy Brown.  These reports are the Sheriff Office's internal incident report system of complaints made against officers.  The Green Team reports summarize the incident, the Sheriff Office's investigation, and any resulting actions such as counseling or discipline.  (Doc. 94-20).  Although Mr. Salvato contends that these incident reports show a pattern of excessive force, a close review

of the documents belies this claim.  Many of the incident reports simply list Deputy Miley or Deputy Brown as a witness, or are "positive observation reports" commending the Deputies on their job performance.  Several other incident reports relate to scenarios that are factually distinguishable, such as an incident where Deputy Brown was forced to shoot an attacking dog, or where Deputy Miley conducted a vehicle pursuit of a driver who ran a stop sign.

Out of the 107 pages of incident reports submitted, Mr. Salvato points to one incident that he claims bears a factual resemblance to the present case.  On March 20, 2011 Deputies Miley and Brown responded to a complaint that a juvenile was "causing trouble" at a community center (Doc. 94-20, pp. 34-39).  The juvenile attempted to flee, was caught and handcuffed, and attempted to flee again.  Deputy Brown pointed his taser at the juvenile and he surrendered.  Deputy Brown did not discharge his taser, and neither Deputy fired their weapons.  The Court fails to see how this lone incident was sufficient to place Sheriff Blair on notice that his training on the use of excessive force, deadly force, and tasers was insufficient and/or deliberately indifferent to a citizen's constitutional rights.  A plaintiff cannot establish a municipal liability claim when he cannot "point to any other incidents involving similar facts."  Mercado, 407 F.3d at 1162 (citations omitted).

Thus, although Mr. Salvato has submitted a list of purported complaints, he has not identified similarities in incidents or shown that any complaints of prior similar incidents had merit.  As this Circuit has noted, " 'the number of complaints bears no

relation to their validity.'" Gold, 151 F.3d at 1351 (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987)).  See also Mercado, 407 F.3d at 1162 ("[Plaintiff] was given a list of all cases involving excessive force, but he cannot show that any of them involved factual situations that are substantially similar to the case at hand.").

Lastly, Mr. Salvato cites to two pieces of evidence:  the grand jury report and the expert testimony of Dr. Alpert.  The grand jury report by itself is not sufficient to create a material issue of fact that Sheriff Blair failed to properly train his deputies for several reasons.  First, the Court has not yet determined whether the report is admissible evidence, or constitutes inadmissible hearsay (Doc. 136, p. 5). See also Btesh, 2011 WL 3269647 at ** 17-18.  Second, the grand jury report does not conclude or state that any purported training deficiencies actually caused Joshua's death; rather, the report contains supposition that if Joshua had been properly handcuffed, he would not have been shot.  See Doc. 94-21, pp. 4-5.  Third, even if the grand jury report could be interpreted in such a manner, there is simply no evidence in the record that Sheriff Blair was aware of any training deficiencies such that municipal liability can attach. "[S]howing merely that additional training would have been helpful in making difficult decisions [or p]roving that an injury or accident could have been avoided if an employee had [ ] better or more training, sufficient to equip him to avoid the particular injury-causing conduct[,] will not suffice." Connick v. Thompson, ___ U.S. ___, 131 S. Ct. 1350, 1363-64 (2011).

Mr. Salvato's reliance on his expert's testimony suffers similar deficiencies.  Dr. Alpert opined that too much time passed between the taser training courses for deputies.  Dr. Alpert testified that such training should occur every 12 months, not once each calendar year.[10]  However, Dr. Alpert also could not point to any legal authority that would require training to be conducted on a 12 month versus calendar year basis.  At most, this testimony might show that the length of time between taser training courses was administered in an untimely manner – it does not create a genuine issue of material fact that the training was inadequate and/or likely to result in violations of constitutional rights.  And, without any evidence of relevant prior incidents suggesting a widespread pattern of abuse, the Court will not allow a municipal liability claim to go forward.[11]

Summary judgment will be denied as to the portion of the § 1983 claim seeking municipal liability with respect to Deputy Miley's shooting of Joshua.  Summary

_____

[10]If training is conducted  a calendar year basis it is conceivable that an officer could receive taser training on January 1, 2013, which would complete the 2013 calendar year requirement, and not receive taser training again until December 30, 2014, leaving a gap of up to 24 months between training courses.

[11]Mr. Salvato's citation to Oliver v. City of Orlando, 2008 WL 4000863 (M.D. Fla. Aug. 22, 2008) is unpersuasive.  In Oliver, the district court found that a taser policy which permitted officers to use tasers in response to "passive resistance" was unconstitutional.  Marion County Sheriff Office's Operations Directive 4034.00 which governs the use of tasers makes no mention of "passive resistance."  (Doc. 72-1, pp. 83-87).  The Directive instead speaks solely to persons who are non-compliant, resistant, potentially combative, displaying violent tendencies, or are armed with potentially deadly weapons.

judgment will be granted in favor of Sheriff Blair as to all other portions of the § 1983 claim.[12]

## III.  Wrongful Death Claims

Mr. Salvato also seeks relief from all three Defendants under Florida's Wrongful Death Act, Fla. Stat. §§ 768.16-768.26.   Each Defendant seeks summary judgment on these claims as well.

Deputy Miley contends that she cannot be held liable because Florida law authorized her to use deadly force against Joshua if she reasonably believed that such force was necessary to defend herself from bodily harm while arresting him.  See Fla. Stat. § 784.07(2)(b).  See also City of Miami v. Sanders, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) ("Law enforcement officers are provided a complete defense to an excessive use of force claim where an officer 'reasonably believes [the force] to be necessary to defend himself or another from bodily harm while making the arrest.'"). Because material issues of fact remain in dispute concerning whether Deputy Miley was objectively reasonable in the use of deadly force on the night of July 6, 2012, the Court finds that material issues of fact also remain in dispute with respect to the wrongful death claim against Deputy Miley.

––––––––––––––––––––

[12]It appears that Mr. Salvato has abandoned his municipal liability claim on the theories that Sheriff Blair had a constitutionally inadequate procedure for hiring deputy sheriffs, inadequately supervised his employees, and/or promulgated a custom, policy or practice whereby deputies failed to intervene in an excessive force incident.

Deputy Miley also argues that she is entitled to statutory immunity under Fla. Stat. § 768.28(9)(a), which provides in relevant part:

> No officer, employee, or agent of the state or of any of its subdivisions shall be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Deputy Miley contends that she did not act in bad faith, with a malicious purpose, or in a manner exhibiting wanton or willful disregard to Joshua's rights. Again, material issues of fact are in dispute on this point. A reasonable jury could conclude that Joshua was no longer a physical threat, but was attempting to flee from Deputies Miley and Brown at the time Deputy Miley shot him without any advance warning. In such circumstances, a reasonable jury could also conclude that Deputy Miley's use of deadly force was not objectively reasonable, and that she acted in wanton and willful disregard of Joshua's rights.

Deputy Brown contends that he is not liable for Joshua's death because he did not shoot him, and that his multiple taserings of Joshua did not contribute to his death. However, Mr. Salvato has submitted the expert opinion and testimony of Dr. Suite which refutes this argument. It is Dr. Suite's opinion that Deputy Brown's multiple taserings of Joshua after he was shot hastened Joshua's blood loss, resulting in his death before paramedics could arrive. In other words, Dr. Suite opines that Deputy

Brown's actions were a contributing factor in Joshua's death.[13]   Further, Deputy Brown has submitted the expert opinion and testimony of Kris Sperry, M.D., as well as the testimony of the Medical Examiner, both of whom will testify that the sole cause of Joshua's death was the gunshot wound to his abdomen.   This conflicting testimony creates a material issue of fact that precludes summary judgment.

Deputy Brown also argues that he is entitled to statutory immunity under Fla. Stat. § 768.28(9)(a) because he did not act in bad faith or in a willful or wanton manner. Disputed fact issues abound with respect to this claim.   A reasonable jury could find that Deputy Brown acted in bad faith or with willful or wanton disregard to Joshua's rights when he repeatedly tasered Joshua after he had been shot and handcuffed. Summary judgment will therefore be denied as to Deputies Miley and Brown on the state wrongful death claims.[14]

Sheriff Brown also claims that he is protected by statutory immunity under Fla. Stat. § 768.28.   While not entirely clear, it appears that his argument is two-fold:   (1) if the Court finds that Deputies Miley and Brown did not engage in any wrongdoing, then Sheriff Brown would also not be liable based on the doctrine of respondeat superior; and (2) if a jury finds that Deputies Miley and Brown acted in bad faith or in

---

[13]The Court has previously denied Deputy Brown's motion to exclude Dr. Suite's expert testimony and opinion.  (Doc. 136).

[14]Deputy Brown also seeks summary judgment as to Mr. Salvato's claims for hedonic damages.  The Court struck Mr. Salvato's claims for Joshua's pain and suffering damages and hedonic damages in its Order of May 5, 2014 (Doc. 136).

a manner exhibiting willful and wanton disregard of human rights, then Sheriff Blair also would not be liable pursuant to the language of § 768.28(9)(a).  See Doc. 72, p. 18. Both of Sheriff Blair's arguments are foreclosed by the Court's holdings that material issues of fact remain in dispute concerning Deputies Miley and Brown's actions on the night of July 6, 2012.  Summary judgment is therefore also due to be denied as to Sheriff Blair.

### Conclusion

Accordingly, upon due consideration, it is hereby ORDERED as follows:

(1)     Defendant Sheriff Chris Blair's Motion for Summary Judgment (Doc. 72) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is DENIED with respect to the portion of the 42 U.S.C. § 1983 claim (Doc. 14, Count I) addressing Sheriff Blair's purported ratification of Deputy Miley's shooting of Joshua Salvato.  In all other respects the motion for summary judgment is GRANTED.

(2)     Defendant Deputy Norman Brown's Motion for Summary Judgment (Doc. 74) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is GRANTED with respect to the portion of the 42 U.S.C. § 1983 claim (Doc. 14, Count III) addressing the purported denial of medical care.  In all other respects, the motion for summary judgment is DENIED.

(3)     Defendant Deputy Lauren Miley's Motion for Summary Judgment (Doc. 75) is GRANTED IN PART AND DENIED IN PART.  Summary judgment is GRANTED with

respect to the portion of the 42 U.S.C. § 1983 claim (Doc. 14, Count II) addressing the purported denial of medical care.   In all other respects, the motion for summary judgment is DENIED.

IT IS SO ORDERED.

DONE and ORDERED at Ocala, Florida this 12th day of May, 2014.


UNITED STATES DISTRICT JUDGE


Copies to:   Counsel of Record
             Maurya McSheehy